## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RICKY MILLER, | : | |
| | : | Civil Action No. 09-2891 (JAP) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| LARRY GLOVER, et al., | : | |
| | : | |
| Respondents. | : | |

**APPEARANCES:**

> RICKY MILLER, Petitioner <u>pro se</u>
> #549995 / SBI 285688C
> Northern State Prison
> 168 Frontage Road, P.O. Box 2300
> Newark, New Jersey 07114

> DIT MOSCO, ASSISTANT PROSECUTOR
> WARREN COUNTY PROSECUTOR'S OFFICE
> 213 Second Street
> Belvidere, New Jersey 07823
> Counsel for Respondents

**PISANO**, District Judge

This matter is before the court pursuant to a petition for a writ of habeas corpus under 28 U.S.C. § 2254, filed by petitioner Ricky Miller, challenging his 2006 New Jersey state court conviction. For the reasons stated below, this Court will deny the habeas petition for lack of merit.

I.   <u>PROCEDURAL BACKGROUND</u>

Petitioner, Ricky Miller ("Miller"), was arrested on November 24, 2004, by the New Jersey State Police, on charges of first degree robbery, second degree aggravated assault, third degree possession of a weapon for an unlawful purpose, fourth degree unlawful possession of a weapon, and third degree theft. These charges were the result of an armed robbery that occurred on November 22, 2004 at Smitty's Liquor Store in Knowlton Township, New Jersey.

On February 17, 2005, an Early Disposition Conference ("EDP") was held at which the State offered that Miller plead guilty to one count of first degree robbery and be exposed to a twelve (12) year sentence at the New Jersey State Prison.  The sentence also would include a mandatory minimum period of confinement equal to 85% of the maximum sentence, pursuant to New Jersey's No Early Release Act ("NERA").  Miller rejected the plea offer and the matter was then held for Grand Jury.

On March 2, 2005, the Warren County Grand Jury returned an indictment on all the above charges except the theft charge.  An arraignment conference was held on April 3, 2005.  On or about April 20, 2005, petitioner's application to represent himself was heard, and the state court granted the application, allowing Miller to represent himself with the assistance of stand-by counsel to be appointed by the Public Defender's Office.

Numerous pre-trial motions were filed and heard from April 26, 2005 through November 16, 2005, including Miller's motion to suppress, which was denied on November 16, 2005.

On November 18, 2005, a pre-trial conference was held. The pre-trial memorandum indicated that a Wade hearing and a motion to dismiss would be heard immediately before trial. Trial was scheduled to commence on November 29, 2005. Jury selection commenced on November 29, 2005. The Wade hearing was conducted on December 5, 2005, after which the trial court ruled that the in-court and out-of-court identification of Miller by the victim could be used at trial. The trial started on December 6, 2005, with opening statements.

On December 20, 2005, the jury returned a verdict of guilty against Miller on all counts. Miller filed a motion for a new trial which was denied on January 23, 2006, after a hearing was held on the motion on January 20, 2006. On April 3, 2006, the trial court sentenced Miller to an aggregate term of twenty (20) years in prison with an 85% parole disqualifier pursuant to NERA.

Miller filed a direct appeal from his conviction and sentence before the State of New Jersey Appellate Division. On February 5, 2008, the Appellate Division affirmed the conviction, but remanded the matter for an amendment of the judgment of conviction to reflect that the conviction for third degree possession of a weapon for an unlawful purpose should have merged

3

for sentencing purposes with the conviction for first degree robbery.  Miller filed a petition for certification before the Supreme Court of New Jersey.  The New Jersey Supreme Court denied certification on April 2, 2009.

Miller filed his initial habeas petition pursuant to 28 U.S.C. § 2254, on or about June 2, 2009.[1]  Miller filed a motion to amend his petition on February 8, 2010, which included the amended petition with supporting declaration.  (Docket entry no. 8).  This Court granted the motion to amend in an Opinion and Order entered on September 29, 2010.  (Docket entry nos. 13 and 14).  The amended petition was docketed on October 5, 2010 (Docket entry no. 15), but it was the same petition that had been

---

[1]  Pursuant to the "prison mailbox rule," a habeas petition is deemed filed on the date the prisoner delivers it to prison officials for mailing, not on the date the petition is ultimately filed with the court.  See Houston v. Lack, 487 U.S. 266, 270-71 (1988); see also Burns v. Morton, 134 F.3d 109, 112-13 (3d Cir. 1988) (applying prison mailbox rule set forth in Houston, which dealt with filing of an appeal, to a pro se prisoner's filing of a habeas petition).  Although the Court is unable to determine the exact date that Miller handed his petition to prison officials for mailing, Miller signed a certification of his application for pauper status on June 2, 2009.  See Henderson v. Frank, 155 F.3d 159, 163-64 (3d Cir. 1988) (using date prisoner signed petition as date he handed it to prison officials for purposes of calculating timeliness of habeas petition).  Accordingly, the Court finds that June 2, 2009 was the date this petition was filed for purposes of calculating the timeliness of the petition, and not the date the petition was received by the Clerk of the Court on June 11, 2009.

submitted by Miller when he filed his motion to amend the petition on February 8, 2010.[2]

The respondents filed an answer to the habeas petition on or about February 19, 2010, with a limited record. (Docket entry no. 10). On October 5, 2010, Miller filed a motion seeking to have the respondents certify and file all transcripts from the state court record. (Docket entry no. 16). This Court granted Miller's motion in an Opinion and Order entered on May 31, 2011. (Docket entry nos. 18 and 19). On June 3, 2011, respondents filed the relevant state court transcripts. (Docket entry no. 20). Miller filed his traverse/reply to respondents' answer on or about July 5, 2011.[3] (Docket entry no. 22).

## II.   FACTUAL BACKGROUND

The facts of this case were recounted below and this Court, affording the state court's factual determinations the appropriate deference, see 28 U.S.C. § 2254(e)(1), will simply reproduce the factual recitation as set forth in the unpublished opinion of the Superior Court of New Jersey, Appellate Division,

---

[2]   Petitioner also filed a motion for appointment of counsel, which was denied by this Court on June 23, 2010. (Docket entry nos. 11 and 12).

[3]   On or about November 10, 2011, Miller filed a motion for a date certain for the Court to rule on his habeas petition. (Docket entry no. 25). This motion becomes moot by virtue of this Court's Opinion herein.

decided on February 5, 2008, with respect to petitioner's direct

appeal from his judgment of conviction and sentence:

> Defendant was charged with having committed the following offenses regarding the allegation that he robbed a liquor store in Knowlton Township and assaulted the store's clerk, Rajeshbhai Patel, on November 22, 2004: first-degree robbery, N.J.S.A. 2C:15-1(a)(1); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d); and third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2).

> Defendant sought to represent himself at trial. Following a hearing, the trial judge found that defendant knowingly and voluntarily waived his right to counsel and that he could proceed pro se; the judge, however, also appointed a standby counsel.

> The trial occurred over the course of six days. Evidence that the jury was entitled to credit revealed that at approximately 8:00 a.m. on November 22, 2004, Patel was working alone at his cousin's liquor store in Knowlton when defendant entered and walked to a beer cooler. No one else was then in the store. Although Patel did not then know defendant's name, he recognized defendant from his appearance in the store four or five times within the prior two weeks, and on another occasion approximately two months earlier.

> Defendant removed a malt liquor from the cooler and placed it on the counter in front of Patel. He then walked to the deli counter and asked Patel to get him a quarter pound of potato salad. Patel advised defendant that the total cost was about four dollars. Defendant said he did not have enough money; Patel responded that defendant could pay what he had and bring the balance the next time. When Patel returned from the deli counter with the potato salad, defendant reached out and cut Patel on the left side of his face with a box cutter. Defendant then placed the box cutter against Patel's neck and made a "slight cut" there as well.

> While continuing to hold the box cutter against Patel's neck, defendant pulled him toward the cash register and demanded its contents. Patel complied and defendant next

demanded all the money in the nearby lottery-game register.
Again Patel followed defendant's instruction.  Patel later
testified that he was "scared" and felt "the pain there on
my neck" where defendant held the box cutter.  He also
testified that $820 was stolen from the liquor store.

After obtaining the cash from both registers, defendant
released Patel and told him not to try to follow him as he
"rushed through the door."  Patel did not attempt to follow,
but instead tried to stop the flow of blood "oozing" from
his face and neck.

Soon thereafter, a customer approached the store and saw
inside that Patel was bleeding.  The customer approached a
state trooper who was conducting radar speed surveillance on
the highway about 200 to 300 yards away.  The trooper
notified his dispatcher and went to the store, where he
found Patel holding a towel over cuts on his face and neck.
Later, Patel gave a description of his assailant, telling
the police that the man had a scar or some abnormality
involving his nose.  Following this, Patel was transported
to a hospital, where the cut on his face was closed with
sixteen stitches and the cut on his neck was closed with
four stitches.  He was released from the hospital the same
day.

Detective Howard Brown of the State Police led the ensuing
investigation.  He contacted the Pennsylvania State Police
(PSP) concerning a report that a suspect may have crossed a
nearby bridge into Pennsylvania.  This lead proved
insubstantial, but the PSP advised Detective Brown that
similar crimes had been committed in Pennsylvania during the
previous three days by a man with a "cut scar" on his face,
who was armed with a box cutter and driving a Volvo.  The
PSP sent Detective Brown a composite depiction of the
suspect in the Pennsylvania crimes, which Brown later showed
to Patel.  Patel noticed similarities but indicated that the
scar on his assailant's nose and face was different.

The next day, November 23, 2004, the PSP received an
informant's tip which indicated that defendant was the
person who committed the Pennsylvania robberies.  The PSP
prepared a six-man photographic array that included
defendant's photograph.  The State Police also learned that
at least one of the Pennsylvania crime victims positively
identified defendant as the culprit.  In addition, the PSP
gathered information that indicated defendant had used his

7

father's Volvo during the robberies. This information was relayed to Detective Brown.

Later that same day, Detective Brown had another trooper show the six-man photographic array to Patel, who immediately selected defendant's photograph as depicting the robber of the liquor store.  At trial, Patel positively identified defendant as the man who assaulted him and robbed the liquor store.

With Patel's positive identification, the police began searching for defendant and the Volvo he was believed to be using.  The State Police learned that defendant was employed by a tree-trimming company in the Rockaway area and may have been staying in the Mountainside Inn in Rockaway.  They determined at the Mountainside Inn that defendant had a room there but had not been present for a week.

On November 24, 2004, a police officer in Washington Township observed defendant "fall[] off a lumber truck" and then "jump on another moving vehicle."  When defendant failed to comply with the officer's directions, he was arrested for disorderly conduct.

The arresting officer testified that defendant smelled of alcohol and was "hard to understand ... because he was rambling."  The Washington Township police subsequently learned that there were "active warrants" outstanding for defendant's arrest.  That same day, the Washington Township police contacted Detective Brown to advise that they had arrested defendant.  Brown was also advised that defendant had been in the vicinity of the Broadway Motel on Route 57 when he boarded the lumber truck from which he fell prior to his arrest.

Armed with this information, Detective Brown and other investigators went to the Broadway Motel where they found a Volvo, which matched the description and had the same license plate number as the Volvo that defendant was reported to be operating in the area.  Detective Brown then checked with the motel staff and learned that a man fitting defendant's physical description had rented a room there in the name of defendant's father.  Brown then was led by a motel staff member to this rented room, which they found "in disarray [as if] a possible fight had gone on in the room." The officers did a quick sweep to make sure no injured person was present in the room.  Detective Brown directed another officer to guard the room so that it would not be

disturbed pending issuance of a search warrant.  The
officers also looked through the windows of the Volvo, and
observed that it was filled with clothes.  Brown ordered
that the vehicle be impounded and taken to a State Police
compound where it could be safeguarded pending the issuance
of a search warrant.  He took this action because he "didn't
know if anybody else had the key to the vehicle" and was
concerned that someone could come and drive it away or
tamper with or remove its contents.

A superior court judge later issued a search warrant for the
Volvo.  The ensuing search uncovered a utility knife with
red stains on its blade and handle that tested positive for
human blood.  At trial, the State presented expert testimony
drawn from DNA analysis, which revealed that the blood that
stained the box cutter's blade and handle came from Patel.

At the trial's conclusion, defendant was found guilty as
charged in the indictment.

(Ra[4]288-294, February 5, 2008 Appellate Division Opinion, at pp.

1-7).

### III.   STANDARD OF REVIEW

A pro se pleading is held to less stringent standards than

more formal pleadings drafted by lawyers.  Estelle v. Gamble, 429

U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).

A pro se habeas petition and any supporting submissions must be

construed liberally and with a measure of tolerance.  See Royce

v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney

General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v.

Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399

U.S. 912 (1970).  Thus, because Miller is proceeding as a pro se

---

[4]   "Ra" refers to Respondents' appendix, which consists of
the state court record provided by respondents in answer to the
habeas petition and amended petition.

litigant in this matter, the Court will accord his habeas petition the liberal construction intended for pro se petitioners.

Section 2254(a) of Title 28 of the United States Code gives the court jurisdiction to entertain a habeas petition challenging a state conviction or sentence only where the inmate's custody violates federal law.  28 U.S.C. § 2254(a).

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); 28 U.S.C. § 2254(a); accord Barry v. Bergen County Probation Dep't, 128 F.3d 152, 159 (3d Cir. 1997).  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." Smith v. Phillips, 455 U.S. 209, 221 (1982).  Generally, "[i]f a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable," Engle v. Isaac, 456 U.S. 107, 120 n. 19 (1982), and "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

In reviewing a § 2254 petition, a federal court is not permitted to address a federal constitutional claim pertinent to

10

the facts of the case unless the petitioner asserts the claim as a ground for relief.  That is, "errors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997). In addition, "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim." Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997)(citations and internal quotation marks omitted); see also Smith v. Zimmerman, 768 F.2d 69, 71, 73 (3d Cir. 1985).

In addition to the case law, the Antiterrorism and Effective Death Penalty Act ("AEDPA") limits a federal court's authority to grant habeas relief when a state court has adjudicated petitioner's federal claim on the merits.  See 28 U.S.C. § 2254(d).  Where a federal claim was "adjudicated on the merits" in state court proceedings, the writ must be denied unless adjudication of the claim either involved an unreasonable application of clearly established federal law, or was based on unreasonable determination of the facts in light of the evidence before the state court.  See 28 U.S.C. § 2254(d).

The unreasonableness standards of § 2254(d) govern only claims that were "adjudicated on the merits in State Court proceedings."  28 U.S.C. § 2254(d).  "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on

11

the substance of the claim advanced, rather than on a procedural, or other, ground." Rompilla v. Horn, 355 F.3d 233, 247 (3d Cir. 2004)(citations and internal quotation marks omitted), reversed on other grounds sub nom. Rompilla v. Beard, 545 U.S. 374 (2005); see also Rolan v. Vaughn, 445 F.3d 671, 678 (3d Cir. 2006). A state court may render an adjudication on the merits of a federal claim by rejecting the claim without any discussion whatsoever. See Rompilla, 355 F.3d at 247. See also Chadwick v. Janecka, 312 F.3d 597, 605-06 (3d Cir. 2002), cert. denied, 538 U.S. 1000 (2003)(citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)(even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference)). On the other hand, "[i]f the petitioner's legal claims were presented but not addressed by the state courts, 28 U.S.C. § 2254(d) does not apply." Rolan, 445 F.3d at 678. See also Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000)(with respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000).

If the New Jersey courts adjudicated the petitioner's claims on the merits, this Court may not grant relief unless either § 2254(d)(1) or § 2254(d)(2) is satisfied. See 28 U.S.C. § 2254(d). Accordingly, this Court may not grant habeas relief to the petitioner unless the adjudication of a federal claim by the

12

New Jersey courts involved an unreasonable application of clearly established Supreme Court law, see 28 U.S.C. § 2254(d)(1), or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding and Adamson is in custody in violation of the Constitution or laws or treaties of the United States.   See 28 U.S.C. § 2254(a), (d)(2).

When the grounds raised in the petition are governed by 28 U.S.C. § 2254(d)(1), the court must begin its analysis by determining the relevant law clearly established by the Supreme Court.   See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004). Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000).   A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71, 72 (2003).

A decision is "contrary to" a Supreme Court holding within 28 U .S.C. § 2254(d)(1), if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." Williams, 529 U.S. at 405-06.   Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the

13

correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Whether a state court's application of federal law is "unreasonable" must be judged objectively; an application may be incorrect, but still not unreasonable.[5] See id. at 409-10. "The unreasonable application test is an objective one–a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly." Thomas v. Varner, 428 F.3d 491, 497 (3d Cir. 2005) (quoting Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005)).

Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the state court." Id.; see also 28 U.S.C. § 2254(e)(1). The Third Circuit has ruled that this presumption of correctness based upon state court factual findings can only be overcome by clear and convincing evidence. See Duncan, 256 F.3d at 196 (*citing* 28 U.S.C. § 2254(e)(1)). Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings." Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

---

[5]   See also Marshall v. Hendricks, 307 F.3d 36, 71 n. 24 (3d Cir. 2002)("[D]ecisions of federal courts below the level of the United States Supreme Court may be helpful to [a court] in ascertaining the reasonableness of state courts' application of clearly established United States Supreme Court precedent, as well as helpful amplifications of that precedent.")(citations and internal quotation marks omitted).

IV.   ANALYSIS

Miller raises five grounds for relief in his habeas petition, as follows:

A.   The admission of other crime evidence after the State made a stipulation that other crime evidence would not be offered denied Petitioner of a fair trial.

B.   The State Prosecutor violated Petitioner's right to a fair trial by vouching for the credibility of the victim's eyewitness identification.

C.   The trial court erred in denying Petitioner's motion to suppress evidence seized from the automobile and motel room.

D.   The State violated Petitioner's Sixth Amendment right to a speedy trial and his Fourteenth Amendment right to due process.

E.   The victim was shown an unduly suggestive photograph, tainting the identification procedure and denying Petitioner his right to a fair trial.

The State responds that Miller's claims should be denied for lack of merit.

A.   Admission of Other Crime Evidence

Miller's first ground for relief asserts that the admission of other-crimes evidence at trial deprived him of his constitutional right to a fair trial.  Miller alleges that the State had introduced other-crimes evidence at trial after stipulating that other-crimes evidence would not be offered.  The other-crimes evidence pertained to his arrest in Washington

15

Township on a disorderly conduct charge.  Miller claims that the

State's conduct deprived him of a fair trial and violated his

Fourteenth Amendment right to due process.

Miller raised this claim on direct appeal in state court.

The Appellate Division addressed Miller's claim in a lengthy

discussion, as follows:

> Defendant claims he was prejudiced by testimony that
> revealed he was arrested in Washington Township on a
> disorderly conduct charge, claiming that the circumstances
> did not render this information admissible pursuant to
> N.J.R.E. 404(b).
>
> The record indicates that defendant raised his concern about
> other-crimes evidence and the State had stipulated prior to
> trial that it would not offer other-crimes evidence pursuant
> to N.J.R.E. 404(b).  As a result, when defendant reiterated
> this concern during the course of trial, the prosecutor
> stated that he would speak to Detective Brown and other
> police witnesses prior to their testimony to ensure that
> nothing prejudicial would be put before the jury.
>
> On the next day of trial, Detective Thomas Leahy of the
> State Police testified.  Unfortunately, the prosecutor did
> not caution Leahy before he took the witness stand about not
> revealing the fact of defendant's arrest in Washington
> Township.  Leahy testified during direct examination that
> the police had learned that defendant had a room at the
> Mountainside Inn in Rockaway.  When asked whether the police
> found defendant at that motel, Leahy responded in the
> negative but added that "[w]e got a call earlier that
> morning ... that [defendant] was arrested by Washington
> Township [police]."  Defendant immediately objected,
> claiming this testimony improperly injected other-crimes
> evidence into the case.  When the trial judge indicated that
> he would "cover it with an instruction," defendant persisted
> that the testimony mandated a mistral.  The judge denied
> that request and gave the following cautionary instruction
> to the jury:
>
> > Evidence of other offenses can never be considered by a
> > jury as indicating a propensity of somebody to commit
> > offenses.  The fact that you may have heard a witness
> > say that [defendant] had been arrested really doesn't

16

mean anything.  You and I can be arrested for any
number of things and may or may not be charged with
anything, but you are arrested.  That may not be used
by you, the fact that you heard that word, which I'm
going to instruct you to disregard, probably wasn't the
proper word for the officer to say, but that's the way
policemen express things.  And it's not relevant to
this case, it has nothing to do with the alleged
robbery that occurred two days prior to that.  It just
has to be disregarded by you.

The judge also indicated to counsel after excusing the jury
for lunch that he remained of the belief that the jury had
to be given some explanation of why the police went to the
Broadway Motel, and he assured defendant that the
explanation would be given in a manner that would not be
"unreasonably prejudicial."

The next day, Detective Brown testified.  Unfortunately,
despite the prosecutor's representation that he had
previously advised Brown not to mention, among other things,
the Washington Township arrest, the following occurred
during his direct examination:

    Q. ...  What did you do next?

    A. ...  After obtaining the warrant, ... we just had no
    idea where [defendant] was.  So we were looking for
    locations of information that we had and I was one of
    the ones that actually went to the Montain[side] Inn
    ... because that was the information that we had that
    he was there.

    Q.  And there was no Mr. Miller, correct?

    A.  He wasn't physically there, but he had a room he
    rented there and [motel personnel] were familiar with
    him.

    ....

    Q.  Okay.  After not seeing Mr. Miller there what, if
    anything did you do?

    A.  Um, that was it for that day.  <u>The next day we were
    notified that he had been arrested by Washington
Borough Police</u>.

    [Emphasis added].

Defendant immediately objected, and the trial judge again instructed the jury that "we have been over that ground before."  He nevertheless reminded the jury that

> [t]he fact that somebody gets arrested, it can happen to us, [it] doesn't mean we are guilty of anything, the police had some contact.  I'll sustain that objection.  Disregard that answer.

Again, at a sidebar, defendant unsuccessfully requested a mistrial.

We are chagrined about the State's failure to abide by its stipulation to avoid presenting other-crimes evidence and the insistence of its witnesses to utter the very thing that defendant sought to preclude and the prosecutor vowed to prevent.  Notwithstanding the unfortunate blurting out of this potentially prejudicial information, we find no abuse of discretion in the judge's handling of the matter and we find no reason to second-guess the judge's discretionary denial of defendant's requests for a mistrial.  State v. Harvey, 151 N.J. 117, 205 (1997).  The question whether a mistrial should be ordered generally turns on whether the potential prejudice may be eradicated through cautionary instructions.  State v. Witte, 13 N.J. 598, 611 (1953), cert. denied, 347 U.S. 951 [] (1954).  The inappropriate comments, which the prosecutor did not attempt to elicit from either witness, were brief, and the judge forcefully instructed the jury to disregard them.

We also find no prejudice to defendant because soon after the evidence was blurted out and the jury was instructed by the judge, defendant reopened the door by asking Detective Brown during his cross-examination whether he knew "what time [defendant] was arrested."  Brown replied that he did not know because he was not present and reiterated that Washington Township police had arrested defendant.  Defendant asked the same question again, to which the trial judge ruled that the question "ha[d] been asked and answered," in an apparent attempt to foreclose any further inquiry by defendant into the very area as to which he had previously objected.  Notwithstanding that effort, defendant then referred Detective Brown to his investigative report and again asked if he knew what time defendant had been arrested in Washington Township.  Brown responded that "[w]e reported an incident occurred at Washington [Township at] approximately 7:02 a.m."  Later, during additional testimony regarding certain photographs, the prosecutor responded that

photographs revealing defendant's "condition when he was
arrested in Washington" were provided in discovery.

After the jury was excused for the day, defendant again
moved for a mistrial in light of the prosecutor's reference,
during discussion about photographs, to defendant's arrest
in Washington Township.  The prosecutor argued that the
reference was inconsequential in light of the fact that
defendant repeatedly elicited testimony about his arrest
from Detective Brown.  The trial judge indicated that an
explanation regarding the Washington Township arrest might
be necessary in light of the fact that both parties had
commented upon it.

The next day, the trial judge revisited the issue, pointing
out to defendant that "[t]he jury now knows that you were
arrested" and asking defendant what he wanted the court to
do about it.  Defendant first asked for a curative
instruction but then moved for a mistrial.  The judge denied
the motion for a mistrial but indicated he would give
another curative instruction over defendant's objection that
this would only "reinforce" the prejudice.  The judge then
instructed the jury that:

> I've talked about [defendant's] arrest on two
> occasions.  I'm going to talk about it one more time.
> After his arrest for the first degree armed robbery or
> between that arrest and the commission of the alleged
> crime, [defendant] was arrested for a disorderly
> persons offense in Washington [Township].  That's a
> minor offense, that's like a traffic offense. ...
>
> The fact that he was arrested is irrelevant.  You may
> not consider that in any way in dealing with the
> offense of the alleged armed robbery.  Just disregard
> that.  It happened.  I want to tell you what it was.
> It was not a serious offense.  It has nothing to do
> with this case and you are not to consider that for any
> fashion.

Defendant again objected, arguing that this instruction
"attract[ed] more attention to the arrest" and again
requested a mistrial. The judge rejected this, correctly
observing that this information came up during defendant's
examination of Detective Brown and that the arrest had
ceased to e a "secret."  As a result, the judge concluded,
and we agree, that "it [was] best to clarify" the situation
and he did so by advising the jury of its innocuousness and

by forcefully directing the jury not to consider that information for any reason.

We assume for present purposes that the testimony regarding the Washington Township disorderly conduct arrest constituted other-crimes evidence inadmissible by N.J.R.E. 404(b) and that Detectives Leahy and Brown improperly blurted out this information during direct examination. Whether those comments warranted the granting of a mistrial was a matter that rested in the sound discretion of the trial court, Harvey, supra, 151 N.J. at 205; Witte, supra, 13 N.J. at 611, and we are satisfied that the judge did not abuse his discretion in this regard.  Instead, the judge quite appropriately and effectively sustained defendant's objections in front of the jury and gave the jury strong cautionary instructions.

That would have been a satisfactory end to the matter but for defendant's insistence upon reopening that door on a number of occasions during his own cross-examination of Detective Brown.  Once defendant so persisted, the judge quite correctly concluded that it was no longer sufficient to simply instruct the jury to disregard this testimony but that he should instead explain to the jury what occurred and why it should play no role in the jury's ultimate determination of the issues.  We conclude that defendant's own invitation to Detective Brown to testify about the Washington Township arrest suggested that defendant did not deem this information to be prejudicial and, as a consequence, we reject defendant's arguments to the contrary.

(February 5, 2008 Appellate Division Opinion at Ra297-304).

The Supreme Court has held that "the Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." Marshall v. Lonberger, 459 U.S. 422, 438 n. 6 (1983).  The admissibility of evidence is generally a question of state law which is not cognizable under habeas review.  See Keller v. Larkins, 251 F.3d 408, 416 n. 2 (3d Cir. 2001)("A federal habeas court, however, cannot decide whether the evidence in question was properly

allowed under the state law of evidence"), <u>cert</u>. <u>denied</u>, 534 U.S. 973 (2001). <u>See also</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 70 (1991)(holding that the state court's admission in petitioner's trial for murdering his infant daughter of the testimony of two physicians that the child had suffered child abuse did not violate due process because the evidence was relevant to intent).

To be sure, the United States Court of Appeals for the Third Circuit has held that the admission of evidence may violate due process where the evidence "undermine[d] the fundamental fairness of the entire trial." <u>Keller v. Larkins</u>, 251 F.3d at 413; <u>see also</u> <u>Lesko v. Owens</u>, 881 F.2d 44, 51 (3d Cir. 1989)("the erroneous admission of evidence that is relevant, but excessively inflammatory, might rise to the level of a constitutional violation"); <u>Bisaccia v. Attorney General</u>, 623 F.2d 307, 313 (3d Cir. 1980)(when "the probative value of ... evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission, then use of such evidence by a state may rise to the posture of fundamental fairness and due process of law"), <u>cert</u>. <u>denied</u>, 449 U.S. 1042 (1980). However, this Court is not aware of any Supreme Court case clearly establishing that the admission of prior convictions or bad acts evidence constitutes a violation of federal constitutional rights or due process. <u>See</u> <u>Minett v. Hendricks</u>, 135 Fed. Appx. 547 (3d Cir. 2005)(rejecting claim that admission of "other crimes" evidence is contrary to or an unreasonable application of clearly established Supreme Court

precedent).  Indeed, Supreme Court precedent suggests the
contrary.  See, e.g., Estelle, 502 U.S. 62 (allowing evidence of
prior injuries in a trial for infant murder); Spencer v. Texas,
385 U.S. 554 (1967)(rejecting due process challenge to admission
of evidence of prior similar crimes when judge gives limiting
instruction).  "[The Supreme] Court has held on numerous
occasions that it is not an unreasonable application of clearly
established Federal law for a state court to decline to apply a
specific legal rule that has not been squarely established by
this Court."  Knowles v. Mirzayance, 556 U.S. 111, 129 S.Ct.
1411, 1419, 173 L.Ed.2d 251 (2009)(quotations omitted).  Because
the admission of Miller's Washington Township arrest was not
contrary to, or an unreasonable application of clearly
established federal law, as determined by the Supreme Court,
Petitioner is not entitled to habeas relief on this ground.  See
Albrecht v. Horn, 485 F.3d 103, 128 (3d Cir. 2007)("Where
evidence of a defendant's prior bad acts is admitted, a
defendant's interests are protected by a limiting instruction,
which mitigates the possibility of prejudice"), cert. denied, 552
U.S. 1108 (2008); Charlton v. Franklin, 503 F.3d 1112, 1115 (10th
Cir. 2007)(state court's admission of evidence of petitioner's
prior bad acts did not render trial fundamentally unfair or
warrant habeas relief); Minett v. Hendricks, 135 Fed. Appx. 547
(3d Cir. 2005)(rejecting claim that admission of "other crimes"

evidence is contrary to or an unreasonable application of clearly established Supreme Court precedent).

This Court's review of the state court record confirms that the trial judge gave very strong cautionary limiting instructions to the jury after information concerning Miller's Washington Township arrest for disorderly persons offense had been repeatedly referenced during the direct examination and cross-examination of Detective Brown at trial.  Moreover, Miller himself placed the issue before the jury by his own questions about it during his cross-examination of Detective Brown. Therefore, there is no indication that the state courts unreasonably applied established federal law in reaching its decision, or that the state court decision was based on an unreasonable application of the facts in light of the evidence presented at trial.  Miller has not demonstrated that the state court opinions, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified. Matteo, 171 F.3d at 891.  Accordingly, Miller's request for habeas relief on this ground is denied.

B.  Prosecutor's Conduct Vouching for Eyewitness Credibility

In his second ground for relief, Miller argues that the prosecutor violated his right to a fair trial, in violation of the Fourteenth Amendment, by vouching for the credibility of the victim's eyewitness identification.  (Petition, ¶ 12B. Ground two).  Specifically, Miller alleges that, during the State's

23

summation, the prosecutor expressed his personal belief or opinion as to the truthfulness of the victim's testimony when the victim's identification testimony was a hotly contested issue. This Court construes this claim as essentially asserting prosecutorial misconduct.

Miller raised this claim on direct appeal.  The Appellate Division rejected Miller's claim, finding as follows:

> Defendant also argues that his right to a fair trial was violated when the prosecutor vouched for the truthfulness of the State's witnesses during his summation.
>
> It is true, as the State argues, that "[p]rosecutors are afforded considerable leeway in closing arguments [so] long as their comments are reasonably related to the scope of the evidence presented." State v. Frost, 159 N.J. 76, 82 (1999).  However, it is improper for a prosecutor to express a "professional belief or opinion as to the truth or falsity of any testimony." State v. Marshall, 123 N.J. 1, 154 (1991)(citations omitted); see also State v. Bradshaw, 392 N.J. Super. 425, 437 (App. Div.), certif. granted, 192 N.J. 481 (2007); State v. Staples, 263 N.J. Super. 602, 605 (App. Div. 1993).
>
> Here, the prosecutor discussed in his summation the testimony of Patel and Lieutenant Brian Graupe about Patel's identification of defendant from the photographic array.  He rhetorically asked whether it was conceivable that Graupe acted improperly with regard to the identification process, which was fair comment, but then exceeded proper bounds by answering his rhetorical question with "I would sincerely doubt it," and by affirmatively stating that the testimony of Patel and Graupe was "similar and it was consistent because it was both the truth" (emphasis added).
>
> This vouching was not an isolated incident.  The prosecutor later argued in his summation that nothing "came out" during the cross-examination of Patel "as a lie" because "[n]othing was," and that Patel was "calm and [told] you what happened" during cross-examination, as he faced defendant, and "nobody was telling a lie because he didn't lie."  The prosecutor also argued to the jury on two occasions that Patel had made a "perfect ID" of defendant.

Again, a prosecutor may forcefully argue that a witness is credible so long as "the prosecutor does not personally vouch for the witness." Bradshaw, supra, 392 N.J. Super. at 437 (citing State v. Walder, 370 N.J. Super. 549, 560 (App. Div.), certif. denied, 182 N.J. 148 (2004)).  This means that the prosecutor may argue that the evidence should persuade the jury that a witness was telling the truth, but the prosecutor may not provide a personal belief that the witness testified truthfully.  Marshall, supra, 123 N.J. at 154.  We agree with defendant that the prosecutor crossed this fine line of advocacy.

However, defendant did not object to these comments during the trial and has made these arguments for the first time in this appeal.  As a result he was required to convince us that these erroneous comments were clearly capable of producing an unjust result.  R. 2:10-2.  After carefully considering defendant's arguments in light of the overwhelming evidence of his guilt and in light of the prosecutor's entire summation, as well as the jury instructions given by the judge after this summation, which indicated that counsel's statements do not constitute evidence, we are not convinced that the prosecutor's improper vouching was capable of producing an unjust result.

(February 5, 2008 Appellate Division Opinion at Ra304-306).

Habeas review of a claim based on prosecutorial misconduct is limited to determining whether the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  "The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219 (1982).  If it does not infect the entire trial, misconduct alone is not enough to warrant a new trial.  Id. at 220.  "A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments [or conduct] standing alone,

for the statements or conduct must be viewed in context." <u>United States v. Young</u>, 470 U.S. 1, 11 (1985).

However, the U.S. Supreme Court has recognized the obligation of a prosecutor to conduct a criminal prosecution with propriety and fairness.

> He may prosecute with earnestness and vigor – indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. ... Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

<u>Berger v. United States</u>, 295 U.S. 78, 88 (1935).

"Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." <u>Moore v. Morton</u>, 255 F.3d 95, 107 (3d Cir. 2001).

When a prosecutor's opening or closing remarks are challenged in a habeas petition, again, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986) (quoting <u>Donnelly</u>, 416 U.S. at 643).  In determining the likely effect of improper comments, a court may consider whether the

comments were responsive to or invited by prior comments made by opposing counsel. Darden, 477 U.S. at 181-82. "Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).

This Court finds that the prosecutor's comments during the summation did not have the capacity on their own to so infect the trial with unfairness as to make the resulting conviction a denial of due process. Moreover, as set forth above, the state court found there was "overwhelming" evidence of Miller's guilt at trial to support the conviction now challenged by him. Therefore, the Court finds no error of constitutional dimension with respect to Miller's claim of prosecutorial misconduct during summation. The remarks by the prosecutor, while admittedly beyond the bounds of proper advocacy, did not serve to infect the trial with unfairness, and thus, did not deprive Miller of due process. Indeed, as discussed above, the Appellate Division evaluated Miller's arguments against the overwhelming evidence of Miller's guilt at trial, as well as the entirety of the prosecutor's summation and the trial judge's jury charges after summation, which stated that counsel's remarks did not constitute evidence and could not be considered by the jury as such.

27

Consequently, the Appellate Division's ruling was not contrary to, and did not involve an unreasonable application of, clearly established federal law; nor was it based on an unreasonable determination of the facts presented in the state court proceedings.  Accordingly, this ground for habeas relief will be denied.

C.  <u>Motion to Suppress Evidence Seized From Auto and Motel Room</u>

Miller further argues that the trial court erred when it denied his motion to suppress the evidence seized from the search of the automobile and motel room.  (Petition, ¶ 12C, Ground three).  Miller raised this argument on a pretrial motion to suppress, as well as bringing this same claim for review on his direct appeal.  In his pretrial motion, Miller had argued that the warrant obtained by Detective Brown was not based upon probable cause that evidence of a crime would be found in either the car that had been impounded or the motel room where the car was parked.  In denying the motion to suppress, the trial judge found:

> The Defendant, pro se, asserts that there was insufficient probable cause to validate the "automobile exception" and the State had failed to prove underlying facts to support probable cause or exigent circumstances.  Specifically, the defendant asserts that there was insufficient probable cause provided to the issuing judge, here Judge O'Connor, from Detective Brown's application for a search warrant after the warrantless seizure of the Volvo.  The defendant also asserts that it was improper for the police to impound the vehicle.  Based on these assertions, the Defendant requests that the Court suppress any evidence obtained from Room #20 at the Broadway Motel as well as any evidence obtained from the seizure of the Volvo.

The Fourth Amendment of the United States Constitution provides that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized."  Article 1, paragraph 7, of the New Jersey Constitution provides similar guarantees.

Warrantless searches are presumptively unreasonable and are thus prohibited unless they fall within a recognized exception.  The New Jersey Supreme Court has stated that there are 11 recognized exceptions to the requirement that law enforcement officers obtain a warrant before searching or seizing an item or a person.  State v. Hill, 115 N.J. 169, 173 (1989).  Those "specific exceptions" are as follows:

1) the "regulatory authority" exception (New Jersey v. T.L.O., 469 U.S. 325 (1985));
2) the "third party intervention" exception (United States v. Jacobsen, 466 U.S. 109 (1984));
3) the "emergency" exception (Thompson v. Louisiana, 469 U.S. 17 (1984));
4) the "plain view" exception (Texas v. Brown, 460 U.S. 730 (1983));
5) the "inventory search" exception (South Dakota v. Opperman, 428 U.S. 364 (1976));
6) the "hot pursuit" exception (United States v. Santana, 427 U.S. 38 (1976));
7) the "community caretaking" exception (Cady v. Dombrowski, 413 U.S. 433 (1973));
8) the "consent search" exception (Schneckloth v. Bustamonte, 412 U.S. 218 (1973));
9) the "search incident to arrest" exception (Chimel v. California, 392 U.S. 752 (1969));
10) the "deceptive guest" exception (Lewis v. United States, 385 U.S. 206 (1967));
11) the "automobile" exception (Carroll v. United States, 267 U.S. 132 (1925)).

It is well-established that when the police have probable cause to believe that an automobile contains evidence of criminal activity, they may conduct a warrantless search and seizure based on exigent circumstances arising from the vehicle's inherent mobility.  Carroll v. U.S., 267 U.S. 132 (1925).  Although inherent mobility was the principal justification for the automobile exception, Courts have

expanded this exception to include parked and unoccupied vehicles. State v. Martin, 87 N.J. 561, 567 (1981). In State v. LaPorte, the Court held that there is "no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." 62 N.J. 312, 316 (1973). In Martin, the Court held it was reasonable for the police to remove a vehicle to the police station before conducting a warrantless search for reasons: (1) the occupants of the vehicle, suspected armed robbers, were still at large and possibly armed and dangerous; (2) the suspects were alerted of the police investigation; (3) the suspects may have returned at any moment to move the car or remove contents in the car; (4) the illumination in the parking lot was dim, at best; (5) and finally, a careful search of the car at that point had become impractical and not safe for the officers. Supra, at 569-70. However, when the vehicle is not readily movable, a warrant must be used so long as securing a warrant is reasonably practicable. Carroll, supra. In Coolidge v. New Hampshire, a vehicle was not subject to a valid warrantless search under the Carroll doctrine because the defendant was arrested and his wife was required to leave the house where the vehicle was located; therefore the vehicle, the Court held, was not readily movable. 403 U.S. 443, 460-61, 91 S.Ct. 2022 (1971). In addition, the probable cause requirement mandates reliable and sufficient facts to prove that a crime has been committed and that seizure of the vehicle will yield evidence of that crime. Martin, supra, at 563, 568. In determining what is probable cause, courts are not called upon to determine whether the offense charged has in fact been committed, but only with the question whether the affiant had reasonable grounds at the time of his affidavit and the issuance of the warrant that the law was being violated. Dumbra v. U.S., 268 U.S. 435, 441, 45 S.Ct. 546, 549 (1925). Further, "if the apparent facts set out in the affidavit are such that a reasonably discreet and prudent man would be lead to believe that there was a commission of the offenses charged, there is probable cause justifying the issuance of a warrant." Id.

In the present case, the defendant asserts that it was improper for the police to impound the vehicle while they awaited execution of the search warrant for the vehicle. Here, unlike the valid warrantless search of the vehicle after impound in Martin, the police guarded the vehicle prior to impound, impounded the vehicle, and then obtained a

30

search warrant prior to any disturbance or search of the
interior of the Volvo.  This Court concludes that it was
proper for the police to remove the vehicle prior to
conducting a search of the vehicle in the motel parking lot,
in plain view of any motel guest or passerby.  Unlike
Martin, in the present case, the defendant had been arrested
therefore allowing time for the police officers to obtain a
search warrant of the vehicle.  See State v. Ercolano, 79
N.J. 25, 46-49 (1979).  This Court is satisfied that the
police acted properly in not only removing the vehicle from
the Broadway Motel parking lot, but in also obtaining a
search warrant after the vehicle was impounded.  This Court
will also note it would be better practice for the officer,
who certifies the return of the search warrant, to actually
conduct the search and inventory or it should be very
clearly stated that the search was done under the direction
of the affiant.  In this case, the actual inventory searches
were conducted by officers other than the one who did the
certification in the return of the search warrant.

Moreover, the defendant also challenges the sufficiency of
the probable cause used to validate the "automobile
exception."  Specifically, the defendant alleges that the
search warrant application fails to provide the issuing
judge with facts and circumstances to issue warrants.  The
affidavit of probable cause in the issuance of the Volvo and
motel room search warrants must be merely based on a "well-
grounded suspicion" that a crime has been committed to
justify the issuance of the warrants.  See Martin, supra.
The facts in the instant case, more than satisfy the
standard.  Here, a robbery occurred at Smitty's liquor
store.  As the New Jersey police investigated this incident,
the Pennsylvania State police provided the New Jersey police
specific information regarding a string of robberies that
occurred close to the Pennsylvania-New Jersey border,
including a suspect description and identification of a
vehicle alleged to be used in the robberies.  Further, one
of the Pennsylvania investigations revealed that Ricky
Miller was the prime suspect and had been identified in a
photo line-up prepared by the Pennsylvania State Police.
The Pennsylvania police also had a composite sketch of the
perpetrator, it was similar to that of Ricky Miller.
Coincidentally, the strange incident a few days after the
Smitty's robbery, involving the suspect Ricky Miller jumping
on vehicles, brought the police to an area near the Broadway
Motel where they noticed the vehicle identified by the
Pennsylvania police.  All of this information was provided
to Judge O'Connor in the search warrant application.  This
Court finds these facts could lead a reasonable person to

conclude a crime had been committed and also sufficiently
justify Judge O'Connor's issuance of the search warrant.

Further, the defendant also alleges that the facts and
circumstances in the search warrant fail to justify a search
of room #20 of the Broadway Motel.  This Court also
disagrees.  When the police arrived in the motel parking
lot, the Volvo was parking in front of room #20.  The police
also checked the registration card for the room, which also
list the Volvo.  These facts would lead a reasonable person
to connect the vehicle to the motel room, and thus justify
issuance of a search warrant for the motel room.  This Court
is also satisfied that probable cause existed and was
indicated in the search warrant application to justify
issuance of a search warrant for the motel room.

Therefore, this Court concludes the police properly
impounded the vehicle prior to the issuance of the search
warrant for the vehicle.  Further, this Court also finds
probable cause existed and was presented to the Judge
O'Connor for the issuance of search warrants for both the
vehicle and the motel room.  Therefore, all evidence seized
by the New Jersey State police either from the Volvo or from
the hotel room at the Broadway hotel may be used as evidence
of the crime.

(November 16, 2005 written Opinion of Hon. John H. Pursel,
J.S.C., Ra158-162).

In addition, Miller raised this claim on direct appeal.

However, the Appellate Division found Miller's arguments on this

ground to lack sufficient merit to warrant discussion in a

written opinion.  (February 5, 2008 Appellate Division Opinion at

Ra296).

The Fourth Amendment to the U.S. Constitution, made

applicable to the states through the Due Process Clause of the

Fourteenth Amendment, see Mapp v. Ohio, 367 U.S. 643 (1961),

provides:

The right of the people to be secure in their persons,
houses, papers, and effects, against unreasonable searches

and seizures, shall not be violated, and no Warrants shall
issue, but upon probable cause, supported by Oath or
affirmation, and particularly describing the place to be
searched, and the persons or things to be seized.

U.S. Const., Amend. IV.

Generally, speaking, evidence gained through a Fourth
Amendment violation may not be used against a defendant at trial.
See Mapp v. Ohio, 367 U.S. at 654-55; Weeks v. United States, 232
U.S. 383, 391-93 (1914).  This "exclusionary rule" is a
judicially-created remedy to safeguard Fourth Amendment rights by
deterring police conduct that violates those rights.  Stone v.
Powell, 428 U.S. 465, 486 (1976).

In Stone v. Powell, the Supreme Court examined the nature of
the exclusionary rule, which it characterized as a "judicially
created means of effectuating the rights secured by the Fourth
Amendment" and balanced its utility as a deterrent against the
risk of excluding trustworthy evidence and thus "deflect[ing] the
truthfinding process."  Id. at 482, 490.  Finding that, as to
collateral review, the costs of the exclusionary rule outweighed
the benefits of its application the Court concluded that "where
the State has provided an opportunity for full and fair
litigation of a Fourth Amendment claim, a state prisoner may not
be granted federal habeas corpus relief on the ground that
evidence obtained in an unconstitutional search or seizure was
introduced at his trial."  Id. at 494.  While the federal courts
are not thus deprived of jurisdiction to hear the claim, they are

- for prudential reasons- restricted in their application of the exclusionary rule.  Id. at 494 n. 37.  See also Marshall v. Hendricks, 307 F.3d 36, 81-82 (3d Cir. 2002), cert. denied, 538 U.S. 911 (2003).  "Whether the petitioner actually took advantage of the opportunity is irrelevant; so long as the opportunity was available, the bar against raising the Fourth Amendment claims on collateral review applies."  Jackson v. Diguglielmo, 2006 WL 1147517, 6 (E.D.Pa. 2006)(citing Cohen v. Gillis, 2004 WL 1622026, 3 (E.D.Pa. 2004)).

Moreover, "[a]n erroneous or summary resolution by a state court of a Fourth Amendment claim does not overcome the bar."  Gilmore v. Marks, 799 F.2d 51, 57 (3d Cir. 1986), cert. denied, 479 U.S. 1041 (1987).

The Court of Appeals for the Third Circuit has recognized that there may be instances in which a full and fair opportunity to litigate was denied in state court.  See, e.g., Gilmore v. Marks, 799 F.2d at 57 (observing that a state's "failure to give at least colorable application of the correct Fourth Amendment constitutional standard" might amount to a denial of the opportunity for full and fair litigation); Boyd v. Mint, 631 F.2d 247, 250 (3d Cir. 1980)(assuming, without deciding, that "opportunity" simply means providing procedures by which one can litigate a Fourth Amendment claim, Stone v. Powell does not preclude federal habeas relief when "'the defendant is precluded from utilizing it by reason of an unconscionable breakdown in

that process,'" (quoting <u>Gates v. Henderson</u>, 568 F.2d 830, 840 (2d Cir. 1977), <u>cert</u>. <u>denied</u>, 434 U.S. 1038 (1978))).

This case does not present one of those instances in which a full and fair opportunity to litigate was denied in state court. To the contrary, Petitioner pursued this claim from pre-trial motion through the state appellate process. Accordingly, this Court will not grant federal habeas relief on this claim.

D.  <u>Sixth Amendment Speedy Trial Claim</u>

The Sixth Amendment provides, in pertinent part, "In all <u>criminal</u> prosecutions, the accused shall enjoy the right to a speedy and public trial...." U.S. Const. amend. VI.  The right to a speedy trial is "fundamental" and is imposed on the states by the Due Process Clause of the Fourteenth Amendment.  <u>See</u> <u>Kloper v. North Carolina</u>, 386 U.S. 213, 223 (1967); <u>see</u> <u>also</u> <u>Barker v. Wingo</u>, 407 U.S. 514 (1972).  In <u>Barker</u>, the Supreme Court set forth four factors to be weighed and balanced to determine whether the Sixth Amendment's guarantee of a speedy trial has been violated: (1) the length of the delay; (2) the reason for the delay; (3) whether, in due course, the defendant asserted his right to a speedy trial; and (4) the prejudice to the defendant.  <u>See</u> <u>id</u>. at 530; <u>see</u> <u>also</u> <u>United States v. Dent</u>, 149 F.3d 180, 184 (3d Cir. 1998), <u>cert</u>. <u>denied</u>, 525 U.S. 1085 (1999).  As noted by the Court of Appeals for the Third Circuit, "[t]he length of the delay figures into the speedy trial analysis twice.  First, it is used to determine whether <u>Barker</u> is

35

triggered at all.  Hakeem v. Beyer, 990 F.2d 750, 759-60 (3d Cir.1993).  If the delay is long enough to trigger Barker, it is then analyzed as 'one factor among several,' and courts should measure the 'extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim.'" Conroy v. Leone, 316 Fed. Appx. 140, 143 (3d Cir. 2009)(citing Doggett v. United States, 505 U.S. 647, 652 (1992)).

In the present case, Miller raised a claim during his state criminal proceedings that his right to a speedy trial had been violated.  He first raised the claim at an initial conference on February 17, 2005.  In particular, on November 29, 2005, immediately before jury selection began, Miller again pressed his application for dismissal of the indictment based on undue delay. He claimed that there was prejudice to him by an unreasonable delay in the hearing for his motion to suppress the evidence. Namely, Miller argued that, due to the delays in these motion hearings, he was unable to present his father as a witness.  The trial court denied Miller's application, finding as follows:

> Well, the indictment was returned on March of 2005.  Mr. Miller has been here considerably longer than that. However, that process is not particularly unusual.  There is often a period of time, between arrest and indictment, which is necessitated by the system itself.  There are appointment of attorneys involved.  In this case the refusal of an attorney and the wish to proceed as an individual pro se, which was granted by this court.
>
> The only delay which I am aware of is one which I have dealt with in a summary fashion about the prosecutor failing to file his papers on time.  However, that should not be looked at by the defendant as a block which remains forever on the

prosecutor and may lead to a dismissal of the indictment because of a delay because it really didn't cause that much of a delay.

There was another delay dealing with the providing of the affidavit of probable cause to arrest and the affidavit of probable cause to search, which placed Mr. Miller at some disadvantage because he was sort of boxing at shadows.  That was provided and the searches were all found by this court admissible.

We are now at trial on the 29th of November, right after the Thanksgiving recess.  Mr. Miller points out that there are some witnesses who may not be available because of this delay and because of the time taken to arrive at this point in time.  As his father had ceased attending the court hearings for whatever reason.  They were open to the public. His father is welcome here if he wishes to be.  He was also available by interstate subpoenas if that's desired.  Mr. Miller testifies as to all persons who have been confined because of inability to make bail is a hardship on their families.  The court is certainly aware of that.  Nothing could be more of a hardship than being separated from your families.  However, that's a function of not being able to make bail.

I cannot find that there was any unreasonable period of delay in this matter before a jury trial, nor can I find, secondly, that there was any prejudice to Mr. Miller because of that delay.  And the motion is respectfully denied.

(November 29, 2005 Transcript at P18:L7-19:24).

Miller again raised this claim on direct appeal, and the Appellate Division found, "[a]fter careful examination," that there was "insufficient merit in the arguments" by Miller "to warrant discussion in a written opinion.  (February 5, 2008 Appellate Division Opinion at Ra296).

Having carefully reviewed the state court record in this matter, this Court concludes that there was no unreasonable delay sufficient to cause Miller prejudice in violation of his Sixth

Amendment right to a speedy trial and his Fourteenth Amendment right to due process.  The time frame in this matter reveals a relatively reasonable length of time for Petitioner's criminal trial proceedings.  The incident at issue occurred on November 22, 2004.  Miller was arrested on November 24, 2004.  An Early Disposition Conference took place on February 17, 2005, and it was at this initial juncture that Miller asserted his right to a speedy trial.  The matter was presented to a grand jury on March 2, 2005, and an indictment was issued on that date.  On April 20, 2005, Miller was granted his request to proceed pro se in his trial.  Pretrial motions began on May 16, 2005 and continued on various dates through November 1, 2005.  During these pretrial proceedings, Miller continued to demand a speedy trial.  However, it is observed from the state court record that some adjournments of pretrial motions occurred due to calendering issues of the court, witness availability and Miller's own delay in securing or subpoenaing witnesses after the State rested its presentation of evidence on Miller's motions to suppress.

After pretrial motions concluded on November 1, 2005, the final pretrial conference was held on November 18, 2005, jury selection started on November 29, 2005, trial began on December 6, 2005, and concluded on December 20, 2005.

Based on this time frame and the justifications for some of the minimal delays, this Court finds that the <u>Barker</u> factors have not been met in order to warrant habeas relief on Miller's speedy

trial claim.  Indeed, from Miller's arrest date to the date his trial began was barely more than a year, i.e., 377 days total. More importantly, however, Miller could not demonstrate any prejudice.  Thus, the state courts' determination that Miller's speedy trial rights were not violated is neither contrary to nor an unreasonable application of the governing Supreme Court case law.  Miller is not entitled to relief on this claim.

E.  Identification Procedure Claim

Finally, Miller asserts that the victim was shown an unduly suggestive photograph that tainted the identification procedure, and thus, due process of law was violated when evidence of this irreparably mistaken identification was used at trial.  (Amended Petition at Ground Five).  Miller raised this claim pretrial, and a Wade[6] hearing was conducted on December 5, 2005, after a jury was selected but before the trial began.  Testimony was heard from witnesses, Pennsylvania State Trooper Barletto, New Jersey Detective-Sergeant Brown, victim Rajeshbhai Patel, and New Jersey State Trooper Brian Graupe.  At the conclusion of testimony and evidence (which included a photo array and composite photo), the trial judge rendered his decision on Miller's motion, as follows:

> ...  We heard the testimony of Officer Barletto, who talks about the method that Pennsylvania used to assemble photo lineup.  That photo lineup is precisely the photo lineup which was shown in the victim in this case, which was shown by an impartial viewer who was sergeant, or this one acting Lieutenant, G-R-A-U-P-E, Brian Graupe.

---

[6]   United States v. Wade, 388 U.S. 218 (1967).

On the 22nd day of November 2004 there was an armed robbery allegedly at Smitty's Liquor Store.  The police arrived on the scene after being called by a passerby who had noticed Mr. Patel bleeding in the store and called for their assistance.  Through a sort of unique combination of police work this defendant became a suspect in that robbery.

The New Jersey State Police had sent at the request of Pennsylvania recent photograph of Mr. Miller allegedly to Pennsylvania, which was used in the lineup there.  That lineup was then sent to New Jersey and Sergeant Brown retained the assistance of Lieutenant Graupe to actually show these pictures to the victim.

On the 23rd of November, both Lieutenant Brown and Graupe arrived at Smitty's Liquor Store.  Mr. Patel was asked to join Trooper Graupe in the supply room where there was a desk and an identification process was undergone.

The officer testified, the court believes, that what the testimony of the officer is that he prepared S-13 [photo array] and read it to Mr. Patel and Mr. Patel appeared here with the benefit of a native interpreter, but he does appear to understand the English language.  The officer indicates he read him the preamble in S-13 indicating that we are going to show you a series of pictures.  They may not contain the pictures of the suspect and it's best that an innocent person be free of suspicion than to wrongfully identify an innocent person.

The court is aware of the cross-racial identification issues, which may exist in this case, however, those may be better dealt with by a fact finder, namely the jury in this case.

At any rate, the officer testified that at the time he interviewed Mr. Patel, the item was not stapled as it is today and each picture was shown separately to the victim and the victim was asked if he could identify photograph number one.  He said he could not and then went through in a serial fashion until they reached photograph number four.[7]

---

[7]  The actual testimony of Graupe indicates that Patel identified photograph five immediately after they went through photographs one through four.  Graupe also had Patel look at photograph number six and then photograph five again.  Graupe then had Patel sign and date the back of photograph number five, which he had identified as the culprit.  (December 5, 2005 Wade Hearing Transcript at 70:4-72:22).

The defendant [sic] said that's, get the exact words of the
detective, that's the guy.  That's him.  The officer
indicated that he had Mr. Patel sign his name on picture
number five with the date and the time of the
identification.  Contrary to defendant's belief, the
signature was not on that page, prior to showing it to the
victim.  Mr. Patel then testified and the officer indicated
that Mr. Patel immediately responded to question number five
and said that's him, that's the guy.

Mr. Patel indicated that this was not the first time that he
had seen the defendant.  He recalled that four or five times
prior to the incident in question Mr. Miller, now he knows
Mr. Miller, was in his convenience store or liquor store
prior to this occasion and on approximately a three month
period before this incident Mr. Miller had been in and out,
but there had been a time period that he had not returned.
So mr. Patel had frequent opportunities to witness Mr.
Miller in the store.  The day in question I gather would be
frozen in mr. Patel's mind as he came back with the potato
salad requested by the defendant, the defendant grabbed him
by the neck after having slashed him in the face, held his
neck and cleaned out the cash register.

Mr. Patel is pretty sure of his identity.  He had some
trouble looking at pictures and I could understand when you
are looking at pictures you are looking at a mirror image
and on the frontal view.  The scar is on the left of the
nose, mirror image.  And the scar on Mr. Miller's nose is on
the right.  I should note that there was some cosmetic
affect.  Mr. Miller came to court today and his nose was she
[sic] padded.  That's okay.  For whatever reason the nose
appeared to be the outstanding identifying factor that Mr.
Patel had in his mind with Mr. Miller.  He was questioned,
he had a scar on the right side of Mr. Miller's face as you
face him.

The function of the court is to determine whether or not the
note the photo array in this case was so impermissible
suggestive that the defendant would be prejudiced thereby.
And although it did not comply, completely with the Attorney
General guidelines, the officer testified that he supplied
to him what the process was going to be, he showed the
picture one at a time.  They were separately attached.
These are photographs which appear pretty clear to court,
raising any particular suspicion, except photograph number
five.  The defendant is looking kind of down a little bit
where in the other photographs he is looking directly at the
viewer.

Patel also previously described Mr. Miller as the
description which was shown on D-13 or D-12, the composite
sketch.  It has the eyes wrong.  It has everything else
about right.

Anyway, I do not find that the line number photo lineup used
by the officers was impermissible suggestive.  Therefore, I
need not get to the second tier of that test.

To get back to Neal versus Bigger and the Wade
identification issues, Mr. Patel had numerous opportunities
to observe the defendant at the time of the commission of
the crime, when he first appeared in the store, when he
placed the bottle of Vodka on the counter and when he was
present when the victim brought back the dish of potato
salad.  The witness's degree of attention, as I said before,
I think Mr. Patel's attention was very briefly fixed on Mr.
Miller when his face was slashed and he was looking him in
the eye.  The witness's prior description, man of slight
built, approximately 5 foot 8, brown hair, scar on his nose,
pretty accurate.

Mr. Patel was certainly definite when he identified Mr.
Miller in court, even though Mr. Miller had concealed his
nose.  Mr. Patel walked up to him, looked at his nose and
said yeah, the scar on the right-hand side.  It again was a
mirror image problem of what is left and what is right.  He
had the same problem when he put his hand on the Bible.  Put
you left hand on the Bible , he put his right hand on the
bible and placed his left hand.  I don't know if he's
dyslexic or if it was done as a mistake.  He said it was a
mistake.

Therefore, under the totality of the circumstances, also how
long after Patel saw the defendant was the lineup had?
About a day later, maybe 48 hours later.  So there is no
significant time lapse in this matter.  Under the totality
of the circumstances the identification procedure was not
suggestive or coercive, or conducive to irreparable
misidentification and the defendant has not been denied the
due process.  I find that both the out-of-court
identification and the in-court identification shall be
admissible in further proceedings in this court.

(December 5, 2005 Wade Hearing Transcript, 82:24-88:13).

    Miller raised this claim on direct appeal.  However, the

Appellate Division found Miller's arguments on this ground to

lack sufficient merit to warrant discussion in a written opinion.
(February 5, 2008 Appellate Division Opinion at Ra296).

An accused is entitled to due process protection against the
introduction of evidence of, or tainted by, unreliable
identifications elicited through unnecessarily suggestive
identification procedures.  See generally Manson v. Brathwaite,
432 U.S. 98 (1977) and cases cited therein.

> [R]eliability is the linchpin in determining the
> admissibility of identification testimony....  The factors
> to be considered ... include the opportunity of the witness
> to view the criminal at the time of the crime, the witness'
> degree of attention, the accuracy of his prior description
> of the criminal, the level of certainty demonstrated at the
> confrontation, and the time between the crime and the
> confrontation.  Against these factors is to be weighed the
> corrupting effect of the suggestive identification itself.

Manson, 432 U.S. at 114 (citing Neil v. Biggers, 409 U.S. 188,
199-200 (1972)).  See also United States v. Wise, 515 F.3d 207,
215 (3d Cir. 2008).  Significantly, where "identifications were
entirely based upon observations at the time of the [incident]
and not at all induced by the conduct" of the pretrial
identification procedures, the identification does not violate
due process.  See Coleman v. Alabama, 399 U.S. 1, 7 (1970).

Thus, due process prohibits an in-court identification if
pre-trial identification procedures were "so impermissibly
suggestive as to give rise to a very substantial likelihood of
irreparable misidentification."  Simmons v. United States, 390
U.S. 377 (1968).

In addition, the Supreme Court has recognized that "improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals." <u>Simmons</u>, 390 U.S. at 383.  The Court has identified certain procedures that heighten the risk of misidentification, including such practices as displaying the photo of only a single individual who generally resembles the person the witness saw, showing the witness photos of several persons among which the photograph of a single individual recurs or is in some way emphasized, or indicating to the witness that police have other evidence that one of the persons pictured committed the crime.  <u>Id</u>.  Despite the risk of misidentification, the Supreme Court has not prohibited the employment of photographic identification methods, either in the exercise of its supervisory power or as a matter of constitutional requirement.  <u>Id</u>.  Instead, the Court has required that each case must be considered on its own facts and must be evaluated in light of the totality of surrounding circumstances; also, the Court has noted that the risk of conviction based on photo misidentification "may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error."  <u>Id</u>.

Similarly, in <u>United States v. Wade</u>, 388 U.S. 218 (1967), the Supreme Court held that a pre-trial line-up is a critical stage of a prosecution at which the suspect is entitled to counsel; where counsel is absent, the accused is entitled to a

hearing to determine whether the identification procedure was so
tainted that a subsequent in-court identification should be
suppressed.

Where a trial court has failed to exclude identification
evidence obtained in violation of a defendant's due process or
Sixth Amendment rights, the habeas court must determine whether
the failure to exclude that evidence was harmless constitutional
error under Chapman v. California, 386 U.S. 18 (1967).  See Moore
v. Illinois, 434 U.S. 220, 232 (1977).

The Court of Appeals for the Third Circuit has explained
that the

> Simmons/Stovall[8] inquiry is essentially two-pronged.  The
> first question is whether the initial identification
> procedure was "unnecessarily" or "impermissibly" suggestive.
> This inquiry actually contains two component parts: "that
> concerning the suggestiveness of the identification, and
> that concerning *whether there was some good reason for the
> failure to resort to less suggestive procedures."*  If a
> procedure is found to have been unnecessarily suggestive,
> the next question is whether the procedure was so "conducive
> to ... mistaken identification" or gave rise to such a
> "substantial likelihood of ... misidentification" that
> admitting the identification would be a denial of due
> process.

United States v. Stevens, 935 F.2d 1380, 1389 (3d Cir. 1991)

(citations omitted)(emphasis added by Third Circuit).

Here, the trial court substantially relied on federal
Supreme Court precedent, namely the totality of the circumstances
standard as set forth in Simmons, as well as the reliability

---

[8]  Stovall v. Denno, 388 U.S. 293 (1967), overruled on other
grounds, Griffith v. Kentucky, 479 U.S. 314 (1987).

45

factors discussed in <u>Neil v. Biggers</u>, in reviewing the
identification procedures at issue.  The trial court acknowledged
that the identification procedures used by the police did not
comply with Attorney General Guidelines for such procedures, but
also remarked that the procedure overall was not impermissibly
suggestive.  More importantly, the court evaluated the totality
of the circumstances in the identification procedure, such as the
separation of time between the photo lineup identification (which
was at most 48 hours after the incident) and any suggestion that
the person in the photo was involved in the incident, as well as
the fact that Graupe did not indicate to the witnesses that
person in the photos was under arrest, was a suspect or was
involved in the incident.  Further, the trial court held that
there was no evidence by either the photo lineup itself or by the
testimony of the witnesses that the identification procedure was
suggestive or coercive, or even slightly conducive to an
irreparable misidentification.  The court also remarked that the
victim Patel had seen Miller in the store on four or five
occasions before the incident, and that Patel had several
opportunities at the time of the incident to observe Miller to
make an identification.  His description and the resulting
composite sketch were remarkably similar to Miller (except for
the eyes.  And any discrepancy as to which side the scar was
located on the suspect's nose was dispelled when it was revealed
that Patel was giving a "mirror image" description.  Thus, the

46

<u>Neil v. Biggers</u> factors of reliability (<u>i.e.</u>, the opportunity of
the witness to view the criminal at the time of the crime, the
witness' degree of attention, the accuracy of his prior
description of the criminal, the level of certainty demonstrated
at the confrontation, and the time between the crime and the
confrontation) were scrupulously considered by the trial court
when rendering the decision that, under the totality of the
circumstances, there was no substantial likelihood of irreparable
misidentification.  Indeed, the court found the immediacy of the
identifications soon after the incident and the certainty of
Patel in his identification strongly supported the reliability of
the out-of-court and in-court identifications.  Therefore, having
carefully reviewed the transcript of the <u>Wade</u> hearing and the
state court record overall, this Court concludes that the state
court decisions on this issue were neither contrary to nor an
unreasonable application of controlling federal law.  Nor were
the state courts' factual determinations unreasonable in light of
the evidence presented.  Accordingly, Petitioner is not entitled
to relief on this ground.

V.  <u>CERTIFICATE OF APPEALABILITY</u>

This Court next must determine whether a certificate of
appealability should issue.  <u>See</u> Third Circuit Local Appellate
Rule 22.2.  The Court may issue a certificate of appealability
only if the petitioner "has made a substantial showing of the
denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For

47

the reasons discussed above, this Court's review of the claims advanced by petitioner demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

## CONCLUSION

For the above reasons, this Court finds that the § 2254 habeas petition must be denied, and a certificate of appealability will not issue.  In addition, Petitioner's motion for a date certain for the Court to rule on his habeas petition (Docket entry no. 25) is denied as moot.  An appropriate Order follows.

/s/ Joel A. Pisano
JOEL A. PISANO
United States District Judge

DATED: March 14, 2012